## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GARIN MOORE,** | : | |
| | : | **Civil Action No. 1:02-CV-0535** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **SUSQUEHANNA AREA REGIONAL** | : | |
| **AIRPORT AUTHORITY and** | : | |
| **ALFRED TESTA, JR.,** | : | |
| | : | |
| **Defendants** | : | |

### ORDER

Before the Court are the following post-trial motions filed in the above-captioned case:
Defendants' Rule 50 Motion to Renew Defendants' Motion for Judgment as a Matter of Law and
Alternative Request for a New Trial Under Rule 59 (Doc. No. 130); Defendants' Rule 59(a) Motion to
Alter or Amend Judgment (Doc. No. 129); Plaintiff's Petition for Attorney's Fees (Doc. No. 128) and
supplemental request for such fees (Doc. No. 154); and Plaintiff's Rule 59(e) Motion to Alter or
Amend Judgment (Doc. No. 127). The motions are fully briefed and ripe for disposition. Each motion
will be addressed in turn.

### I.    Factual Background

Plaintiff Garin Moore was an employee of Defendant Susquehanna Area Regional Airport
Authority ("SARAA") from July 2, 2001 until his employment was terminated on March 1, 2002.
Moore worked for SARAA in the Maintenance Department on an at-will basis.

In January and February of 2002, following an adverse change in their employee benefits,
Moore and several other SARAA employees became interested in organizing a union to represent their

interests.  On January 10, 2002, Moore and approximately 20 other SARAA employees met at

Shane's Flight Deck in Highspire, Pennsylvania to discuss the possibility of organizing.  Moore chaired

this meeting.  At the same time, Randy Hicks, the Terminal Manager for the Harrisburg International

Airport ("HIA"), and George Hamilton, HIA's Maintenance Supervisor, were also present at the

restaurant, but did not attend the meeting.  Moore and the attending employees determined that they

would look for a union willing to represent them.  Moore undertook the responsibility of contacting a

number of unions about the organizing effort.  Ultimately, it was determined that Michael Fox, the

Council Director for AFSCME's District Council 89, would meet with the employees.

Shortly thereafter, approximately 15 SARAA employees attended another organizing meeting

at Shane's Flight Deck during which Michael Fox discussed what AFSCME's representation would

entail.  At this time, the employees signed union cards and returned them to Mr. Fox.  In addition,

Moore took another stack of union cards to distribute to other employees who might be interested in

joining.

The SARAA employees scheduled another meeting at Shane's Flight Deck during the evening

of February 8, 2002.  Also on February 8, 2002, employees in the Maintenance Department held a

"family meeting."  The employees typically convened family meetings every other Friday to correspond

with a pay day.  All maintenance employees, garage employees, and middle management typically

attend the family meetings, during which paychecks are distributed, some training is provided, and

employees are informed about relevant airport information.

Defendant Alfred Testa, Jr., SARAA's Director of Aviation, attended the February 8, 2002

family meeting.  Testa advised the maintenance employees about plans for the airport, including the

2

building of a new terminal.  Later, Testa indicated that he was aware of the efforts to organize a union.

Moore testified that during the meeting Testa said, "I don't know who your union instigators are, but . .

. ."  (Tr. 78.)  Taking offense, Moore testified that he raised his hand and said, "I take that personally.  I

am a voting Republican, and I am no friend of organized labor, but when you people came in here and

started crapping on us, we had to do something."  (Id.)  When Testa suggested that Moore discuss the

matter with him in his office, Moore declined, asserting that the employees' concerns needed to be

addressed in an open meeting.  When Testa asked Moore about the employees' specific grievances,

Moore asked to be excused form the meeting in order to retrieve some notes from his car.  Moore

testified that Testa was very agitated at this point during the meeting.  Moore returned to the meeting

and explained that the employees were upset because certain benefits had changed, including vacation

time.  Before he excused himself in order to attend another scheduled meeting, Testa suggested that he

would be willing to meet further with the employees at a later time.  Moore suggested that they meet

with Testa the following Monday.

Following the family meeting, eight employees met at Shane's Flight Deck to again take up the

issue of organizing a union.  Michael Fox of AFSCME was in attendance and advised the employees

that he would notify SARAA that AFSCME was organizing at the airport.

Moore testified that he declined to meet with Testa on the following Monday, having been

dejected by the low employee turnout and because he was hesitant to further irritate Testa about the

union organizing issue.

By letter dated February 11, 2002, Mr. Fox advised Testa about the organizing efforts.  Testa

responded in a letter dated February 13, 2002 in which he acknowledged that he had been aware of

3

the organizing efforts for several weeks.

On March 1, 2002, Moore and three other employees from the Maintenance Department were terminated from their employment with SARAA.  Moore testified that during the meeting at which they were advised of their termination, Testa looked at him and said, "Garin, I'm sorry, but I just don't need a sign painter any more . . . ."  (Tr. 84, 379.)  Testa explained that the employees were entitled to a severance package and provided each of them an official letter of termination.  The letter given to Moore stated two reasons for the termination: (1) scheduled demolition of buildings at HIA and (2) the need to reduce expenses due to economic pressures from the September 11, 2001 terrorist attacks that impaired the airline industry.  (Tr. Ex. 10.)

## II.     Procedural History

On April 2, 2002, Moore filed a complaint against SARAA and Testa, alleging that his employment was terminated in retaliation for his union organizing activities.  On September 30, 2003, the Court granted Moore leave to amend his complaint to include an allegation that Testa acted ultra vires in eliminating his position.  This count was later dismissed, but Moore's claim of retaliation was allowed to go forward.

Trial was held on November 16 and 17, 2004.  At the conclusion of Plaintiff's case, Defendants moved for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure.  Although acknowledging that it was a very close case and that there was very little evidence supporting Moore's claim that Testa knew his identity and of his protected activity, the Court denied Defendants' motion and sent the case to the jury.  (Tr. 314-315.)  The jury returned with a verdict in favor of Moore and awarded him $42,000 in back pay and $20,000 in punitive damages.  At

4

that time, Defendants renewed their motion to judgment as a matter of law, judgment notwithstanding

the verdict, a remittitur and a new trial, if necessary.  (Tr. 467.)  Thereafter, the parties filed several

other post-trial motions that are the subject of this Memorandum and Order.

## III.    Discussion

### A.    Defendants' Motion for Judgment as a Matter of Law

When a trial court denies a motion for judgment as a matter of law at the close of the evidence,

the movant may renew its request by filing a motion no later than ten days after the entry of judgment.

Fed. R. Civ. P. 50.  A motion for judgment as a matter of law should be granted if, viewing the

evidence in a light most favorable to the nonmoving party and giving the evidence the advantage of

every fair and reasonable inference, there is insufficient evidence from which a jury could reasonably

find liability.  Ambrose v. Township of Robinson, 303 F.3d 488, 492 (3d Cir. 2002) (citations

omitted).  In order to prevail, the moving party must show that the jury's findings, presumed or

expressed, are not supported by substantive evidence, or if they [are], that the legal conclusions implied

[by] the jury's verdict cannot in law be supported by the findings.  Valenti v. Allstate Ins. Co., 243 F.

Supp. 2d 221, 223 (M.D. Pa. 2003) (citations omitted).

In considering whether the evidence at trial was sufficient to sustain the jury's verdict, the court

may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts

for the jury's version.  Ambrose, 303 F.3d at 492 (citations omitted).  Although judgment as a matter

of law should not be granted liberally, a mere scintilla of evidence is insufficient to sustain a verdict of

liability.  Id.  The Court is not to ask whether there is literally no evidence supporting the verdict, but

instead whether there is evidence upon which the jury could properly find a verdict for the prevailing

party.  Id. at 493 (citations omitted).  Accordingly, if the evidence of record is insufficient to support the jury's verdict, then motion for judgment as a matter of law should be granted.  Ambrose, 303 F.3d at 493.

Defendants' central argument in support of their motion for judgment as a matter of law is that there was no reliable evidence taken during trial that Testa knew Moore's identity or knew Moore was engaged in union organizing activities when Testa decided to eliminate five positions within the Maintenance Department effective March 1, 2002.  In order to evaluate this argument, it is first necessary to explain what Moore was required to prove in order to support his claim of retaliation.

A public employee's retaliation claim for engaging in protected activity is evaluated under a three-part test.  In order to succeed on a retaliation claim, a plaintiff must show: (1) he engaged in an activity constitutionally protected by the First Amendment; and (2) his protected activity was a substantial and motivating factor in the retaliating action.  Finally, a defendant may defeat a plaintiff's claim of retaliation by demonstrating that the plaintiff's employment would have been terminated even in the absence of the protected conduct.  Ambrose, 303 F.3d at 493.

Defendants concede that Moore's efforts to organize a union constituted activity entitled to protection under the First Amendment.  However, they argue that Moore failed to establish that his union organizing activity was a substantial or motivating factor in his termination.  Defendants chief argument is that "there is absolutely no reliable evidence of record that Testa, the undisputed decisionmaker, knew Moore's identity or knew Moore was engaged in union organizing activities when Testa decided to eliminate five positions effective March 1, 2002."  (Doc. No. 141, at 10.)

In support of this argument, Defendants rely heavily on Ambrose, in which the United States

6

Court of Appeals for the Third Circuit held "it is only intuitive that for protected conduct to be a substantial or motivating factor in a decision, the decisionmakers must be aware of the protected conduct." Ambrose, 303 F.3d at 493.  In Ambrose, the plaintiff, a police officer, received a thirty-day suspension after he provided an affidavit in support of his colleague's lawsuit against the township-employer.  The township claimed it disciplined plaintiff because he entered administrative offices after hours and made misleading entries in his activity logs.  Id. at 491.  The plaintiff alleged that the suspension was imposed in retaliation for offering the affidavit in the litigation against the township.  Id. at 492.  All of the township commissioners who voted to suspend plaintiff testified that they were unaware of the affidavit he provided.  Id. at 493.  At trial, the plaintiff prevailed on his retaliation claim and the district court denied the township's motion for judgment as a matter of law.  Id.  On appeal, the township argued that because the evidence demonstrated that none of the township commissioners was aware of the affidavit, it could not have been a factor in the decision to suspend plaintiff.  Id.

The Third Circuit agreed, emphasizing that "if the Commissioners were unaware of Ambrose's affidavit, it could not possibly have been a substantial or motivating factor in their decision to suspend him, and Ambrose's First Amendment retaliation claim would necessarily fail." Id.  The Court thus reasoned that because plaintiff pointed to no evidence showing that the commissioners knew about the affidavit when they voted, the plaintiff necessarily failed to sustain his burden of proof.  Id.  The plaintiff attempted to prove the township's awareness of his affidavit by pointing to the close temporal proximity between the date he gave the affidavit and the date on which he was suspended.  Id. at 494.  The Third Circuit rejected this argument, noting that although temporal proximity may be relevant to prove causation, it may not be used to prove knowledge of the protected activity in the first place.  Id.

Although <u>Ambrose</u> initially appears highly relevant to the case at bar, upon careful analysis the Court must disagree with Defendants that <u>Ambrose</u> controls, for the facts of the two cases are different in critical respects.  As an initial matter, Defendants' argument is not so much that Testa was entirely unaware of Plaintiff's protected conduct, but rather that Testa was oblivious to Moore's very identity. That is plainly different from <u>Ambrose</u>, where there was no question but that the township commissioners knew plaintiff, but were simply unaware that he had engaged in any protected speech activity.  In the case at bar, there is no question that Testa was aware of the union organizing efforts – he clearly became aware of the organizing when he attended their family meeting on February 8, 2002 and when he exchanged correspondence with Michael Fox of AFSCME acknowledging the union's plans to organize at the airport.

The closer and most relevant question is whether Testa was aware of Plaintiff's role in engaging in, or leading, the union-organizing effort.  Indeed, Defendants acknowledge as much where they argue: "[a]lthough Testa did know there was an attempt to organize and understood that Captain Murray of the fire department was the organizer, like in <u>Ambrose</u>, there is no evidence that he knew Moore was involved."  (Tr. 132.)  The Court finds the facts of <u>Ambrose</u> and the evidence of record in the instant case are distinguishable on this point.

The record reveals that during the family meeting held on February 8, 2002, Plaintiff addressed Testa directly in response to Testa's comment that he did not know who the union "instigators" were. According to the testimony, Moore raised his hand and responded to Testa as follows:  "I take that personally.  I am a voting Republican, and I am no friend of organized labor, but when you people came in here and started crapping on us, we had to do something."  (<u>Id.</u> at 78.)  Testa then requested

8

to know what specific objections the employees had, and Moore advised Testa that the employees were upset about reductions in benefits and vacation time.  (Id.)  Testa invited Moore and a group of other employees to schedule a meeting with him to discuss the issue further.  (Id.)  Assuming that Testa knew of Moore's identity, this evidence could have allowed a reasonable factfinder to conclude that Testa was aware of Moore's protected First Amendment activity.[1]

The critical question, then, is whether Testa knew of Moore's identity at all.  Although the record contains evidence that would have allowed the jury to find that Testa did not know Moore (indeed, had never been introduced to him), there was also evidence taken that Testa was introduced to Moore personally in July 2001.  On cross examination, Defendants attempted to discredit Moore's claim that he met Testa personally by highlighting inconsistencies between Moore's trial testimony and his deposition during which he never mentioned meeting Testa.  Notwithstanding Defendants' attempts to impeach Moore's trial testimony, the jury was presented evidence that Testa was introduced to Moore in July 2001 and the question of Moore's credibility was for the jury to decide.  Additionally, Moore testified that on March 1, 2002, Testa looked at him and addressed him by name before advising him that his employment was being terminated.  Although Defendants also attempted to discredit this testimony, resolving what actually transpired was a question properly entrusted to the jury. From the verdict, it clearly appears that the jury found that Testa knew of Moore's identity.

Following the close of Plaintiff's case and Defendants' oral motion for judgment as a matter of

---

[1]    In Ambrose, the township commissioners were not only unaware that it was plaintiff that had given an affidavit in support of his colleague, they were entirely unaware of the affidavit's existence.  This is obviously different from this case, where Testa concedes he was aware of the union organizing campaign, but claims he had no knowledge that Moore was involved with the efforts.

law, the Court acknowledged that it believed very slim evidence had been presented to support

Moore's retaliation claim.  The Court's initial finding in this regard is unchanged following a thorough

review of the record.  Nevertheless, the Court is constrained to uphold the jury's verdict in favor of

Plaintiff because there was evidence presented at trial that (1) Testa knew about a union-organizing

campaign and addressed the issue with the maintenance employees at the February 8, 2002 family

meeting; (2) Moore spoke directly to Testa during the February 8, 2002 family meeting regarding the

union-organizing effort and the grievances of the maintenance employees; and (3) Testa knew of

Moore's identity, as evidenced by testimony regarding their introduction and Testa's identification of

Moore by name on March 1, 2002.[2]  Taken together, this evidence, although limited, provided the jury

with a sufficient basis upon which they could have found that Plaintiff's employment was terminated in

retaliation for his involvement in the union-organizing efforts of which Testa was admittedly aware.

Defendants also argued that they presented evidence demonstrating that Moore's employment

would have been terminated regardless of his First Amendment activity because the airport was

attempting to cut costs and did not need Moore's services due to plans to build a new terminal with

outside contractors.  During trial, Plaintiff attempted to cast doubt on this assertion

by pointing to evidence he claimed demonstrated the airport's relative financial health and by illustrating

---

[2]     The Court concedes that nothing in the record indicates that Moore introduced himself
to Testa by name during the February 8 meeting, and that this to some degree supports Defendants'
contention that Testa did not know Moore was involved in the organizing efforts.  However, the Court
does not find this issue dispositive – particularly where direct evidence supported the jury's finding that
Moore and Testa had been introduced, that Moore addressed Testa individually at the February 8,
2002 family meeting and apparently took the lead in advising Testa about the employees' grievances,
and that three weeks later Testa addressed Moore personally before terminating his employment.

his various skills and substantial experience that would have been valuable to the airport regardless of the planned construction.  The question of whether an employee would have been terminated regardless of their protected activity is a question properly reserved to the jury.  See Baldassare v. New Jersey, 250 F.3d 188, 195 (3d Cir. 2001) (citation omitted).  The jury was entitled to evaluate the evidence Defendants presented in support of their claim that Moore's job would have been terminated regardless of his protected activity, and to balance this against Moore's evidence offered to suggest that Defendants' claims of financial strain were not credible.  As before, the jury appears to have resolved this matter in Plaintiff's favor, and the Court can find no basis upon which to overturn the jury's finding.

For the foregoing reasons, and that notwithstanding the limited evidence Plaintiff adduced to support his retaliation claim, the Court is constrained to find that the jury was presented with sufficient evidence to find in favor of Moore on his claim that his employment was terminated in retaliation for engaging in union organizing activities.  Accordingly, Defendants' renewed motion for judgment as a matter of law must be denied.

Defendants have moved alternatively for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure.  A new trial may be ordered if it is required to prevent injustice or to correct a verdict that was contrary to the weight of the evidence.  Am. Bearing Co., Inc. v. Litton Indus., Inc., 729 F.2d 943, 948 (3d Cir. 1984).  However, a district court should grant a new trial based upon a verdict being against the weight of the evidence only "where a miscarriage of justice would result if the verdict were to stand."  Williamson v. Consolidated Rail Corp., 926 F.2d 1344, 1352 (3d Cir. 1991).  The purpose of the rule is to ensure that the district court does not replace the jury's verdict with one based upon its own interpretation of the facts adduced at trial.  Olefins Trading, Inc. v. Han Yang Chemical Corp., 9

11

F.3d 282, 290 (3d Cir. 1993).  Courts should grant new trials sparingly, because "[s]uch an action

effects a denigration of the jury system and to the extent that new trials are granted the judge takes

over, if he does not usurp, the prime function of the jury as the trier of the facts."  Lind v. Schenley

Indus., Inc., 278 F.2d 79, 90 (3d Cir. 1960) (en banc).  With these considerations, the decision to

grant a new trial is left substantially to the discretion of the trial court.  Blanca v. Raymark Indus., 972

F.2d 507, 512 (3d Cir. 1992).

 Although the Court found limited evidence in support of Plaintiff's claims, and notwithstanding

the important areas of testimony in which Plaintiff was arguably discredited or impeached, the Court

concludes that each side had sufficient opportunity to present its case and to challenge the other side's

evidence, and that the matter was properly sent to the jury for deliberation.  The Court does not find

that a manifest injustice occurred as a result of the verdict, nor does the Court find that the verdict was

necessarily against the great weight of the evidence.  Accordingly, the Court finds it would be

inappropriate to grant Defendants' request for a new trial.

**B.     Defendants' Rule 59(e) Motion to Alter or Amend Judgment**

Defendants have moved pursuant to Rule 59(e) of the Federal Rules of Civil Procedure to alter

or amend the judgment by (1) reducing Plaintiff's award of actual damages from $42,000 to $30,924

to account for Plaintiff's receipt of unemployment compensation benefits and (2) striking as a matter of

law the jury's award of $20,000 in punitive damages.

Rule 59(e) of the Federal Rules of Civil Procedure authorizes a trial court to amend or alter a

judgment in the event of (1) an intervening change in controlling law; (2) new evidence not previously

available; or (3) a need to correct a clear error of law or prevent manifest injustice.  Fed. R. Civ. P.

12

59(e); North River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir. 1995).

**i.     Offset**

The Third Circuit confronted the issue of whether unemployment benefits should be offset against an award of damages in Dillon v. Coles, 746 F.2d 998 (3d Cir. 1984).  In Dillon, the plaintiff applied for employment at a juvenile detention facility operated by the Commonwealth of Pennsylvania. Id. at 1001. After the plaintiff was denied the position, she claimed the Commonwealth impermissibly refused to hire her on the basis of gender, and she filed a civil suit under Title VII and 42 U.S.C. § 1983.  Id.  Plaintiff prevailed on her claims in the district court and was awarded back pay with a deduction for unemployment compensation she received.  The Third Circuit specifically affirmed the deduction of unemployment compensation because the defendant was the Commonwealth of Pennsylvania, rather than a private party.  Id. at 1007; compare Maxfield v. Sinclair, 766 F.2d 788, 794 (3d Cir. 1985) (affirming district court refusal to offset social security benefits against an award of backpay against a private employer). Dillon appears to dictate that unemployment compensation benefits may be offset against an award of damages when the employer is the state itself, rather than a private employer.  In contrast, Maxfield suggests that unemployment benefits need not be offset where the employer is a private defendant, under the theory that unemployment compensation constitutes a collateral benefit.

It is undisputed that SARAA is a municipal authority created under Pennsylvania's Municipal Authorities Act, 56 Pa. C.S. § 5601 et seq. and is therefore an "agenc[y] of the Commonwealth." Accordingly, Defendants contend that SARAA's status as a public entity dictates that the $11,076 in unemployment compensation Moore received should be offset from his damage award in this action.

Plaintiff opposes the motion to reduce the damage award, noting that SARAA has not indicated a clear intention to repay the unemployment benefits to the Commonwealth, and pointing to several cases in which district courts have refused to reduce awards on the grounds that unemployment compensation benefits are collateral and should not be used to reduce a defendant's legal obligation to make a plaintiff whole unless the defendant was the Commonwealth of Pennsylvania.  See, e.g., Taylor v. Central Pa. Drug & Alcohol Servs. Corp., 890 F. Supp. 360, 370 (M.D. Pa. 1995); Gallo v. John Powell Chevrolet, Inc., 779 F. Supp. 804, 812 (M.D. Pa. 1991).  In Gallo, Judge Muir of this Court has held that only if the Commonwealth of Pennsylvania is the defendant may it deduct unemployment compensation benefits from back pay awards, and only then provided "it would have been entitled to bring a separate action under state law to recoup such benefits."  Gallo, 779 F.2d at 812-13.  See also Robinson v. Southeastern Pa. Transp. Auth., No. 87-5114, 1991 U.S. Dist. LEXIS 8342, *4-8 (E.D. Pa. June 17, 1991) (refusing to offset unemployment benefits from a damage award against state agency, finding the agency was not "the state itself" and had distinguishing characteristics, including the existence of a separate treasury).

The parties have provided the Court with very little information about SARAA, or its financial structure, or its exact relationship with the Commonwealth of Pennsylvania, other than the undisputed fact that it is an agency created under Pennyslvania's Municipal Authorities Act.  Given this limited showing, and in light of the apparent trend among the district courts to refuse to offset damage awards unless the Commonwealth of Pennsylvania is the liable defendant, the Court finds that Dillon does not control this matter, and the Court declines to grant Defendants' motion insofar as it seeks to offset Plaintiff's receipt of unemployment benefits from his award of damages.

14

### ii.      Punitive Damages

Defendants have moved to strike the jury's award of $20,000 for punitive damages, arguing that "there was absolutely no evidence presented at trial from which a reasonable jury could conclude that Testa's conduct satisfied the legal standard for an award of punitive damages."  (Doc. No. 142, at 7.)

Whether sufficient evidence exists to support an award of punitive damages is a question of law for the Court.  Alexander v. Riga, 208 F.3d 419, 430 (3d Cir. 2000).  Punitive damages may not be recovered against a municipality in a § 1983 action for retaliation.  Russoli v. Salisbury Township, 126 F. Supp. 2d 821, 873 (E.D. Pa. 2000).  However, punitive damages may be recovered against individual state actors where it has been shown that the individual defendant's conduct was driven by evil motive or intent, or when it involved reckless or callous indifference to the federally protected rights of others.  Coleman v. Kaye, 87 F.3d 1491, 1497 (3d Cir. 1996); Keenan v. City of Philadelphia, 983 F.2d 459, 469, 70 (3d Cir. 1992).  In an action for retaliation brought under § 1983, such a heightened showing may not be satisfied on the basis of retaliatory motive alone.  Brennan v. Township of Teaneck, 350 F.3d 399, 429-30 (3d Cir. 2003).

The Court has noted that very limited evidence was offered in support of Plaintiff's retaliation claims.  Although the Court is constrained to uphold the jury's verdict on the basis of the evidence in the record, the Court cannot find that sufficient evidence supports the jury's imposition of punitive damages in this case.  Nothing in the record touched upon Testa's intentions or demonstrated a reckless or callous indifference to Moore's federally protected rights.  In opposing this motion to alter or amend the judgment, Plaintiff offered no citation to the record for support, but merely opines that "a

reasonable jury could have found that Testa wanted, and expected, that these firings would stop, or at least put a severe damper on, union organizing." (Doc. No. 143, at 7.) In the absence of any evidence regarding malice or reckless disregard of Moore's constitutional rights, the Court cannot agree that a jury's possible speculation alone can sustain an award of punitive damages, and particularly where the very evidence offered at trial to prove retaliation was itself so limited. Accordingly, the Court finds that the jury's award of punitive damages must be stricken.

### C. Plaintiff's Rule 59(e) Motion to Alter or Amend Judgment

Plaintiff has moved to alter or amend the judgment to reinstate Moore's employment with SARAA or, alternatively, provide him with front pay for five years. Defendants oppose the motion, arguing that Moore never raised these claims for equitable or injunctive relief before or during trial, and any claims to such relief should now be barred. Defendants further argue that the cases Moore relies on in support of the motion are distinguishable or not binding upon this Court.

Upon review of Moore's complaint, his amended complaint, and his pretrial brief, the Court must disagree with Defendants' assertion that Moore waived his claim to reinstatement. In Plaintiff's prayer for relief in his initial complaint his first request was that the Court enter "[a]n order requiring Defendants to reinstate Plaintiff Garin Moore to his former position." (Doc. No. 1.) Moore repeated his request for reinstatement in his amended complaint. (Doc. No. 35.) Furthermore, in his pretrial brief, Moore explained the relief he was seeking as follows:

> Moore is requesting this Court to enter an Order requiring SARAA to restore him to his employment and to reinstate him to his former position. Should reinstatement be found by the Court not to be practical, Moore would like an award of front pay in lieu of reinstatement.

(Doc. No. 103, at 14.)  In light of Moore's clear and repeated request for reinstatement, the Court

cannot agree with Defendants that he waived his right to seek reinstatement or front pay.

Defendants argue that a number of the cases cited by Moore in support of his prayer for

reinstatement are distinguishable because in all of the cases the plaintiffs had expressly requested front

pay, reinstatement, or injunctive relief during trial or in the instructions submitted to the jury.  However,

as noted, the Court finds that Plaintiff did, in fact, seek reinstatement at all times during this action.

Defendants contend that Alexander v. Riga, 208 F.3d 419 (3d Cir. 2000) stands for the

proposition that a plaintiff waives his right to claim a specific remedy if the plaintiff "does not object to

the jury instructions regarding remedies."  Id. at 434.  In Alexander, a group of tenants and a tenants'

rights organization brought suit against two landlords, alleging that defendants discriminated on the basis

of race in violation of the Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq. ("FHA"), among other

civil rights laws.  Id. at 423.  Following an eight-day trial the jury returned a special verdict finding, inter

alia, that the landlord had violated the FHA but also finding that the discrimination was not a legal cause

of harm to the individual plaintiffs, and refusing to award any damages.  Id. at 424-425.  On the basis of

the special verdict, the district court declined to submit to the jury the issue of punitive damages, which

had been bifurcated from the liability portion of the case.  The district judge entered judgment in favor

of the landlord and against the individual plaintiffs.  Id. at 425.  Thereafter, the individual plaintiffs

appealed a number of issues, including their claim that because the jury found the landlord liable for

repeated violations of the FHA on the basis of racial discrimination, the district court should have

entered some type of injunctive relief in order to protect the rights of the individual plaintiffs, and as a

matter of policy in order to safeguard access to fair housing.  Id.

17

Taking care to note it was "troubled by the district court's rationale" in denying injunctive relief on the basis that there was no evidence of a continuing or recurrent violation on the part of the landlords, the Court agreed with the district judge that the plaintiffs had waived their right to seek injunctive relief where they waited six days following the close of trial in order to request a further hearing on whether such relief was appropriate.  Id. at 434.  In affirming this aspect of the district court's order, the Third Circuit held that regardless of the plaintiffs' request for injunctive relief in their complaint and pretrial statements, "the issue [was] waived by the failure of counsel to raise the issue of injunctive relief prior to the conclusion of trial."  Id.

The Court finds the holding of Alexander distinguishable from the case at bar.  First, it should be noted that Alexander was not a retaliatory discharge case, but was rather an action under the Fair Housing Act.  Neither party has briefed the issue of what the standard is for granting injunctive relief under the FHA, nor the policy considerations that courts should consult when confronted with a request for such relief.  Regardless, for the reasons discussed at length below, the Court finds that the Third Circuit has unequivocally emphasized that reinstatement or other equitable relief should be awarded in cases of First Amendment retaliation brought under 42 U.S.C. § 1983 absent unusual or persuasive evidence that reinstatement is unwarranted or impractical.  Furthermore, it would appear that in Alexander, the plaintiffs had requested an additional hearing to determine whether injunctive relief was appropriate in the first instance; as discussed below, the law with respect to First Amendment retaliation claims is that equitable relief is presumed to be an important means of achieving the goals of "make-whole" relief.  See Squires v. Bonser, 54 F.3d 168, 172 (3d Cir. 1995) (discussed at length below).

18

In further support, Defendants cite to <u>Colegrande v. City of Erie</u>, No. 90-106, 1991 U.S. Dist. LEXIS 18217 (W.D. Pa. July 25, 1991) and <u>Beilan v. Sun Company, Inc.</u>, No. 88-2085, 1990 U.S. Dist. LEXIS 9314 (E.D. Pa. July 25, 1990). In <u>Colegrande</u>, a jury returned a verdict in favor of plaintiff on claims brought under the Age Discrimination in Employment Act and awarded plaintiff $72,500. Plaintiff moved for entry of judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure, and requested, <u>inter alia</u>, that the court award reinstatement or front pay. <u>Colegrande</u>, 1991 U.S. Dist. LEXIS 18217 at *1. The Court found plaintiff's request for reinstatement or front pay to be "troublesome," apparently because plaintiff did not request that the jury find the amount of front pay to which he might be entitled. <u>Id.</u> at *6. In denying Plaintiff's request for reinstatement or front pay, the court held that such relief was unavailable because plaintiff failed to request an instruction on the issue of front pay, and because the amount of front pay to be awarded must be fixed by the jury. <u>Id.</u> (citing <u>Maxfield v. Sinclair Int'l</u>, 766 F.2d 788, 796 (3d Cir. 1985).

To the extent that the unpublished decision in <u>Colegrande</u> suggests that a jury must first consider whether a plaintiff should be awarded future pay as a prerequisite to the Court considering whether reinstatement is appropriate in the first instance, the Court declines to follow its reasoning. The <u>Colegrande</u> court conflated reinstatement and front pay throughout its analysis, and then inexplicably cited to the absence of a jury finding on front pay as a reason for denying reinstatement. The court's analysis in this regard is confusing, as it implies that a court could not reach the question of whether reinstatement is appropriate without first consulting a jury as to the amount of future earnings that should be assessed in the absence of reinstatement. To follow such an approach ignores the Court's own discretionary authority to assess the availability of reinstatement in the first place as the preferred

19

"make-whole" relief in a case of retaliatory discharge.  For these reasons, the Court finds that

Colegrande is neither controlling nor necessarily a correct statement of the law regarding waiver.

In Beilan, the plaintiff succeeded on his claims of age discrimination under the ADEA and was

awarded substantial damages for back pay.  After the verdict, plaintiff moved for various post-trial

relief, including a request that he be reinstated to his former employment.  Id. at *1.  The district court

denied reinstatement, finding that plaintiff's position had been eliminated and no longer existed due to

downsizing.  Id. at *3.  The court found, during trial, that there was no appropriate position at

defendant company to which plaintiff could be reinstated.  As a result, the district court instructed the

jury on the issue of front pay damages.  Plaintiff did not object to the instruction on front pay, and

plaintiff at all times agreed that he was entitled either to reinstatement or front pay, but not both.  Id. at

4.  After the jury decided that plaintiff was not entitled to any future damages, plaintiff presented "the

novel argument" that he was entitled to reinstatement.  Id.  The court disagreed, noting its finding that

there was no position available to plaintiff at the time of trial, and because plaintiff acquiesced in

submitting the front pay damages issue to the jury.  Id.  Accordingly, the court found that plaintiff had

waived his claim to reinstatement because he agreed instead to have the matter submitted to the jury on

the alternative remedy of front pay.  Id.

Unlike Beilan, this Court made no determination at trial that it would not be feasible to reinstate

Plaintiff to his former employment within the maintenance department at HIA.  Although Defendant

Testa claimed that Plaintiff's position (among others) would have been terminated regardless of his First

Amendment activity, the clear implication of the jury's verdict in Plaintiff's favor is that Defendants'

given reasons for terminating Plaintiff were pretextual.  As in Beilan, Defendants in the instant case

20

asserted that Plaintiff's employment was terminated due to a need to cut costs, and that Plaintiff's job would be unnecessary due to the plans to build a new terminal at the airport.  Were the Court to credit this claim, it would substantially undermine the jury's finding that Plaintiff was, in fact, terminated in retaliation for his union organizing efforts, which must necessarily mean that the jury found Defendants' given reasons for the termination to be untrue.  The Court finds it would be improper to make such a finding and, in any event, the Court finds insufficient evidence in the record to conclude that Plaintiff could not be rehired within the Maintenance Department, particularly given the extensive testimony from Plaintiff regarding his myriad skills and experiences.

Although Defendants never explicitly say as much, it appears that Defendants believe they have been ambushed by Plaintiff's motion and have been prejudiced because the jury was not instructed regarding the requested relief.  The Court has difficulty conceiving how Defendants may have been prejudiced by Plaintiff's failure to raise the issue of equitable relief to the jury in this case, because it is axiomatic that a request for reinstatement is a matter of equity to be decided by the Court:

> Reinstatement is an equitable remedy available in unconstitutional discharge cases arising under § 1983.  The decision whether to award reinstatement thus lies within the discretion of the district court.

Squires v. Bonser, 54 F.3d 168, 171 (3d Cir. 1995) (citation omitted).  The Court therefore finds that it was not improper for Plaintiff to move for reinstatement following the jury's finding that he had prevailed on his retaliation claim.  Cf. id. (reversing court's denial of reinstatement where plaintiff moved for reinstatement ten days after the jury found in favor of plaintiff's retaliation claim and awarded compensatory and punitive damages).

The Third Circuit has made clear the strong presumption in favor of reinstatement in retaliation

cases brought under 42 U.S.C. § 1983, stating that in such cases "a denial of reinstatement is

unwarranted unless grounded in a rationale which is harmonious with the legislative goals of providing

plaintiffs make-whole relief and deterring employers from unconstitutional conduct." Id. at 172.  In

considering whether reinstatement is appropriate, the Third Circuit has instructed that "the central goals

of make-whole relief and deterrence must guide a district court's consideration of reinstatement . . . .

Reinstatement advances the policy goals of make-whole relief and deterrence in a way that money

damages cannot." Id. at 172-73.  Accordingly, "while the availability of money damages may have

significance in the district court's consideration of remedies, reinstatement is the preferred remedy in the

absence of special circumstances militating against it." Id. at 173; see also Feldman v. Philadelphia

Housing Auth., 43 F.3d 823, 831 (3d Cir. 1994) ("The equitable remedy of reinstatement is available

for discharges that violate 42 U.S.C. § 1983, and reinstatement is the preferred remedy to cover the

loss of future earnings").  In reaching this conclusion, the Third Circuit cited approvingly the following

explanation offered by the United States Court of Appeals for the First Circuit:

> Whenever an ex-employee sues alleging wrongful dismissal by a
> government agency, job restoration may be a material aspect of
> meaningful relief.  Yet in the real world, reinstatement in unlawful-
> discharge cases often will place some burden on the agency; there
> will likely be tension (or even hostility) between the parties when
> forcibly reunited; employees who have assumed duties previously
> performed by the fired worker will have to be displaced when he
> or she returns; and, as a result, the public's business may be
> conducted somewhat less efficaciously.  Be that as it may, we agree
> with those courts which have ruled that such routinely "incidental"
> burdens, in their accustomed manifestations, are foreseeable
> sequelae of defendant's wrongdoing, and usually insufficient,
> without more, to tip the scales against reinstatement when first
> amendment rights are at stake in a section 1983 action.

> We do not perceive such a positioning of the weighbeam as a
> departure from general equitable principles.  It is, rather,
> merely a way of setting a starting-point for the district court's
> consideration.  Once this is understood, the "presumption" of
> reinstatement becomes just the dress of thought, a shorthand
> manner of saying that equitable considerations different in kind
> or degree from those regularly accompanying reinstatement must
> be present if reinstatement is to be withheld from the victim of a
> first amendment infraction.

Rosario-Torres v. Hernandez-Colon, 889 F.2d 314, 321-22 (1st Cir. 1989) (en banc).

In Squires, the district court had denied plaintiff's motion for reinstatement on the basis of the following findings:  "(1) 'the evidence at trial did not overwhelmingly support [plaintiff's] claim of constitutional deprivation'; (2) 'there were incidents of poor performance by plaintiff'; (3) plaintiff 'would still be required to work at the side of the defendants'; (4) 'reinstatement would create a delicate balance which could jeopardize required township business which remains the responsibility of the supervisors who, in Pennsylvania, uniquely serve as the executive as well as the legislative branches of government'; (5) this was not 'a case where plaintiff has been unable to secure employment'; and (6) reinstatement would 'not result in the restoration of seniority or pension benefits.'" Squires, 54 F.3d at 174.

The Third Circuit found that none of these factors, on the record developed before the district court, presented the sort of special circumstances necessary to deny a post-trial motion for reinstatement.  Id.  Perhaps most relevant to the case at bar, the Third Circuit unequivocally rejected the district court's finding that the evidence "did not overwhelmingly support [plaintiff's] claim of constitutional deprivation" was a relevant factor for the district court to consider:

> Once the jury has found in favor of plaintiff on liability, the existence

23

> of a constitutional deprivation is an established fact which may not be
> re-examined in the district court's subsequent determinations –
> including determinations of appropriate equitable remedies.  For the
> district court to accord weight to its view of the evidence supporting
> the jury's findings was not "overwhelming" would impermissibly
> interfere with the province of the jury.

Id.  Thus, a finding of liability against the employer "requires the inference that, absent the

unconstitutional conduct, the adverse employment action would not have occurred."  Id.  For this

reason, district courts are required to infer that defendants found liable for First Amendment retaliation

claims failed to carry their burden of demonstrating that they would have reached the same decisions as

to plaintiffs' employment even in the absence of the protected conduct.  Id. at 174 n.10.

Among the other errors noted by the Third Circuit,[3] the Court also held that the district court's

general finding of potential tension that could occur if plaintiff returned to the workplace was insufficient

to deny reinstatement:

> In order to deny reinstatement, more than the ordinary tensions
> accompanying an unconstitutional discharge lawsuit must be present.
> The fact that reinstatement might have 'disturbing consequences,'
> 'revive old antagonisms,' or 'breed difficult working conditions'
> usually is not enough to outweigh the important first amendment
> policies that reinstatement serves [absent] probable adverse
> consequences [that] weigh so heavily that they counsel the court
> against imposing this preferred remedy.'"

Id. at 175 (citations omitted).

Following Squires, the Court finds that Plaintiff must be reinstated to his former employment

---

[3]     In addition to the factors discussed above, the Third Circuit rejected the district court's findings that isolated incidents of poor performance and plaintiff's ability to secure other employment militated against reinstatement.  Squires, 54 F.3d at 175-76.

with SARAA.  The jury found that Defendants impermissibly terminated Plaintiff in retaliation for

exercising in rights protected by the First Amendment and, by implication, must necessarily have found

that Defendants would not have terminated Plaintiff in the absence of such First Amendment activity.

Despite Defendants' assertions to the contrary, it is clear that Plaintiff at all relevant times was seeking

through this litigation to be reinstated to his former employment, and therefore there is no reason to

deny the equitable relief on the basis that Plaintiff somehow waived his claim for equitable relief.  Upon

review of the record, and in the absence of any showing by Defendants, the Court is unable to conclude

the reinstatement should be denied on the basis that such relief would present extraordinary tension or

strife within the workplace causing reinstatement to be unfeasible.  Similarly, the record contains no

evidence of any misconduct on Plaintiff's part while he was employed at SARAA, much less the sort of

egregious misconduct necessary to deny a claim for reinstatement.  See Squires, 54 F.3d at 175 n.12

("[d]enial of reinstatement may be appropriate in cases involving employee misconduct of a particularly

egregious kind").  Finally, as noted above, the Court cannot agree that Plaintiff has waived his claim for

reinstatement by failing to present that claim to the jury.  The determination on whether equitable relief

in the form of reinstatement is warranted rests at all times with the Court, and it is therefore irrelevant

that the jury was not presented with information or instruction about this issue.  The Court finds that

Defendants had ample notice that Plaintiff was seeking an order of reinstatement from the very

beginning of this case; the mere fact that the jury was not apprised of this goal is totally irrelevant to a

consideration of whether such relief is appropriate.[4]

_____

[4]        The Court agrees with Defendants that in the event reinstatement is not feasible, and
future damages are to be assessed as a substitute remedy, then a jury must determine the amount of

Finally, Defendants claim that any order directing reinstatement raises the specter of a potential double recovery for Plaintiff.  Defendants are suggesting that because the jury simply gave a lump sum award for damages, the award may have contemplated future pay.  Accordingly, Defendants appear to be arguing that reinstatement or future pay should be denied because of the risk of double recovery.  The Court disagrees.

This issue was also squarely addressed in <u>Squires</u>.[5]  In <u>Squires</u>, the verdict form contained the following question: "What compensatory damages, if any, did the plaintiff suffer?"  54 F.3d at 176 n.15.  At the close of trial, the district court instructed the jury as follows regarding an award of damages: "plaintiff is entitled to be compensated for any wages that you find that he lost up to this date, or any wages that you find that he may lose in the future."  <u>Id.</u>  Although it was not clear whether the jury's award contained front pay damages, the Third Circuit noted that this was not fatal to plaintiff's claim for reinstatement:

> Appellees contend that, because reinstatement and front-pay are alternative forms of relief, and because Squires was awarded front-

_____

front pay to be awarded.  <u>See</u> <u>Maxfield v. Sinclair Int'l</u>, 766 F.2d 788, 796 (3d Cir. 1985).  However, it is clear that the question of whether reinstatement is feasible in a given case is a matter to be decided by the Court in the first instance.  <u>Id.</u>  The <u>Maxfield</u> Court also stated that "[o]rdinarily, an employee would be made whole by a backpay award coupled with an order for reinstatement.  Reinstatement is the preferred remedy to avoid future lost earnings . . . ."  <u>Id.</u>  Because the Court has found Plaintiff must be reinstated to his former employment, and that such reinstatement is not unfeasible on the record developed by both parties, the Court finds that a jury's hypothetical award of future earnings would serve no purpose.  Accordingly, the Court cannot find that the absence of a jury instruction on future wages was prejudicial to Defendants, or necessarily effected a waiver of Plaintiff's right to seek the equitable relief that he had requested in his complaint, amended complaint, and pretrial brief.

[5]     The Court notes that neither Plaintiff nor Defendants mention <u>Squires</u> anywhere in their papers, despite its obvious relevance and similarity to this action, and because it is binding law within this Circuit.

> pay damages by the jury, relief in the form of reinstatement is
> barred.
>
> We disagree.  It is true that if front-pay was awarded, a grant of
> reinstatement would raise concerns regarding double recovery.
> Such concerns could be alleviated by an order vacating any
> front-pay award; however, it may not be possible in this case to
> isolate the front-pay award since the jury awarded a lump-sum
> amount for compensatory damages.  But this does not foreclose
> reinstatement; rather, it means that the issue of double recovery
> should be resolved by a new trial on compensatory damages.

Id.

In reaching this conclusion, the Third Circuit expressly discouraged the practice of asking juries

for a lump-sum award which includes front pay when a plaintiff also seeks reinstatement.  Squires, 54

F.3d at 176 n.16 ("We believe the preferable course for a plaintiff seeking the equitable remedy of

reinstatement is for such a plaintiff to ask for a jury interrogatory concerning the amount of damages

attributable to front-pay in order to avoid a double recovery").  The Third Circuit also indicated that it

may require plaintiffs to follow such a procedure in the future in order to preserve claims for

reinstatement.  Id.[6]  Even had the Third Circuit imposed this obligation, the Court would find it

inapplicable to this case because the Court did not instruct the jury regarding future damages, and in

fact expressly limited the jury's consideration of damages to back pay: "Actual damages include any

wage or fringe benefits you find plaintiff would have earned in his employment with SARAA if he had

not been discharged on March 1st, 2002, through the date of your verdict."  (Tr. at 450) (emphasis

added.)  This limitation distinguishes the instructions given in the instant case from those at issue in

---

[6]     The Court is not aware that the Third Circuit has, in fact, decreed such a requirement.

Squires, where the jury expressly was invited to consider future damages as part of its lump-sum

award.  In light of Defendants' insistence that Plaintiff waived his right to seek reinstatement by not

tendering to the jury the issue of future damages, the Court is constrained to note that Squires'

admonishment regarding lump-sum damages is irrelevant to the issue of whether an instruction on future

pay is a prerequisite to a claim for reinstatement under the facts of this case.

For all of the foregoing reasons, the Court finds that Plaintiff did not waive his claim for

reinstatement, and that such a claim is warranted on the basis of the jury's finding of retaliation and the

Third Circuit's clear direction in Squires that reinstatement is the preferred "make-whole" remedy

merited upon a finding of retaliatory discharge.  Accordingly, the Court will grant Plaintiff's motion to

alter or amend the judgment and will enter an order directing Defendant SARAA to reinstate Plaintiff to

his former employment within the Maintenance Department at the Harrisburg International Airport.[7]

---

[7]     Because the Court finds reinstatement is warranted, the Court does not reach Plaintiff's alternative request for forward pay.  In an event, an award of future damages is a question for the jury. Nothing in this opinion should be taken to foreclose Plaintiff and Defendants from reaching a settlement in lieu of reinstatement.

### D.      Plaintiff's Motion for Attorney's Fees

Plaintiff has moved for an award of attorneys' fees pursuant to the fee-shifting provision set

forth in 42 U.S.C. § 1988(b).  That statute provides, in relevant part, as follows:

> In any action to enforce a provision of [42 U.S.C. § 1983] . . . the court
> in its discretion, may allow the prevailing party, other than the United
> States, a reasonable attorney's fee as part of the costs . . . .

42 U.S.C. § 1988(b).  Because the jury found in his favor on his retaliation claim and awarded actual

and punitive damages, Plaintiff contends that he is the prevailing party in this action and should therefore

be awarded attorney's fees.  Specifically, Plaintiff requests $76,225 in attorney's fees for services

rendered through the verdict.  Plaintiff has filed a supplemental petition seeking an additional $27,380

for additional fees incurred in responding to and briefing various post-trial motions.  Defendants oppose

Plaintiff's motion and supplemental fee petition, arguing that (1) attorney's fees should not be awarded

for Plaintiff's unsuccessful claims and (2) the lodestar calculation of attorney's fees should be reduced

for unnecessary time incurred or excessive billing.

The accepted method of determining statutory attorneys' fees is the "lodestar" method.  Rode

v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990).  The lodestar amount is calculated by taking the

amount of time reasonably expended by counsel for the prevailing party on the litigation and

compensating that time as a reasonable hourly rate.  Hensley v. Eckerhart, 461 U.S. 424, 433 (1983);

Brytus v. Spang & Co., 203 F.3d 238, 242 (3d Cir. 2000).  The lodestar presumably yields a

reasonable fee.  Washington v. Philadelphia County Court of Common Pleas, 89 F.3d 1031, 1035 (3d

Cir. 1996).

The party seeking attorneys' fees bears the initial burden of proving that the requested fees are

reasonable.  Rode, 892 F.2d at 1183.  To meet this burden, the applicant must "submit evidence

supporting the hours worked and the rates claimed."  Hensley, 461 at 433.  The party opposing the

fees award then has the burden to challenge the reasonableness of the requested fee, by affidavit or

brief with sufficient specificity to give the fee applicant notice of the objection.  Id.; Bell v. United

Princeton Props., Inc., 884 F.2d 713 (3d Cir. 1989).  Once the adverse party raises objections to the

fee request, the district court has considerable discretion to adjust the award in light of those objections.

Id. at 721; Rode, 892 F.2d at 1183.

        Defendants first argue that Plaintiff should not be awarded attorney's fees for time spent

researching and prosecuting unsuccessful claims.  Specifically, Defendants assert that because Plaintiff's

ultra vires claim was dismissed on summary judgment, and because he was denied leave to amend his

complaint to include a claim under Pennsylvania's Sunshine Act, 65 Pa. C.S.A. § 701 et seq., Plaintiff

should not be awarded any fees for time spent related to these claims.  Plaintiff counters that all of his

claims arose out of the same set of operative facts, and are therefore related.  Furthermore, Plaintiff

argues that because he was substantially successful at trial as evidenced by the jury's verdict, the

requested attorney's fees should not be reduced on the basis that Plaintiff achieved only limited success.

        The Court agrees with Defendants that some reduction in claimed attorney's fees is warranted

with respect to Plaintiff's unsuccessful ultra vires and Sunshine Act claims.  It is well established that in

most cases a plaintiff should not recover attorney's fees for unsuccessful claims that are entirely

unrelated to claims on which a plaintiff was successful.  Hensley v. Eckerhart, 461 U.S. 424, 434-435

(1983).  However, in other cases:

                the plaintiff's claims for relief will involve a common core of

30

> facts or will be based on related legal theories.  Much of counsel's
> time will be devoted generally to the litigation as a whole, making
> it difficult to divide the hours expended on a claim-by-claim basis.
> Such a lawsuit cannot be viewed as a series of discrete claims.
> Instead the district court should focus on the significance of the
> overall relief obtained by the plaintiff in relation to the hours
> reasonably expended on the litigation.

Id. at 435.  In those cases "[w]here a plaintiff has obtained excellent results, his attorney should

recover a fully compensatory fee."  Id.  In such circumstances:

> the fee award should not be reduced simply because the plaintiff
> failed to prevail on every contention raised in the lawsuit.
> Litigants in good faith may raise alternative legal grounds for a
> desired outcome, and the court's rejection of or failure to reach
> certain grounds is not a sufficient reason for reducing the fee.  The
> result is what matters.

Id. (citation omitted).

However, where "a plaintiff has achieved only partial or limited success, the product of hours

reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive

amount.  This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in

good faith."  Id.  In such cases, an award of fees, and any reduction thereof, should be determined by

reference to the "degree of success obtained."  Id. at 436. Determining the appropriate award of

attorney's fees in a case such as this where a plaintiff is substantially successful on some claims and

unsuccessful on others is not subject to a rigid application of a rule or formula.  Id.  The Supreme Court

has suggested that district courts may attempt to identify specific hours that should be eliminated, or

courts may opt to reduce the aggregate award to account for a plaintiff's limited success.  Id. at 437.  A

court's discretion in making such a determination must by guided by the considerations the Supreme

Court enunciated in <u>Hensley</u>.   <u>Id.</u>

In this case, Plaintiff achieved a substantial degree of success on his claim of retaliation, as indicated by a jury verdict in his favor and the subsequent award of actual and punitive damages. Furthermore, for the reasons set forth in this opinion, Plaintiff has succeeded on his request for injunctive relief in the form of reinstatement.  Notwithstanding the Court's determination that the jury's award of punitive damages must be stricken, Plaintiff's success on his retaliation claim is clear.

What is less clear is whether Plaintiff should recover some or all of the fees incurred relating to his unsuccessful ultra vires and Sunshine Act claims.  As noted, Plaintiff was denied leave to amend the complaint to include a claim under the Sunshine Act, and this claim plainly did not represent a substantial aspect of this litigation.  The Court does not find that it would be appropriate to shift the fees incurred in connection with this particular claim where such a claim was never even properly set forth in Plaintiff's complaint.  Accordingly, the Court agrees with Defendants that 19.75 hours of counsel's time ($3,950.00) spent on Plaintiff's inchoate Sunshine Act claim is not properly compensable under 42 U.S.C. § 1988.

Plaintiff's ultra vires claim was dismissed at the summary judgment stage, and prior to being dismissed was the subject of litigation between the parties.  Moreover, as Plaintiff notes, the Court previously found that Plaintiff's ultra vires claim arose from the same set of facts as his retaliation claim. Nevertheless, the theory of recovery under an ultra vires claim is substantially different from the retaliation claim that ultimately went to the jury.  The Court agrees with Defendants that Plaintiff should not be compensated in full for the time spent researching and litigating the unsuccessful ultra vires claim.

Although Defendants concede that counsel's time sheets do not break down the precise hours

32

devoted to time spent researching and responding to the various arguments on summary judgment,

Defendants speculate that the entire 53.5 hours of counsel's time spent responding to the motion should

be deemed to have been devoted to the ultra vires claim.  Defendants argue that Plaintiff had previously

briefed the issues related to the retaliation claim, and therefore Plaintiff's counsel should be deemed to

have spent no time at all on the retaliation claim in subsequent briefs.  Accordingly, Defendants suggest

that none of the time spent on the ultra vires claim should be compensable.  The Court disagrees.  The

Court finds that at least some portion of the fees incurred opposing summary judgment appear to have

related to the retaliation claim, and the Court therefore finds it appropriate to award Plaintiff's counsel a

percentage of the fees relating to this work.  The Court will disallow fees related to the ultra vires claim

alone, but will allow Plaintiff 40% of the fees incurred opposing Defendants' motion for summary

judgment. Accordingly, the Court will allow Plaintiff $4280 for time spent responding to the motion for

summary judgment, but will disallow Plaintiff's request for fees relating exclusively to the ultra vires

claim.[8]

 Defendants also argue that Plaintiff's counsel spent 26.55 hours of unnecessary time on tasks

that were secretarial in nature or otherwise unwarranted.  The Court has reviewed these time records,

and does not find that all are improper, overly general entries indicative of secretarial or non-

professional services.  The Court can see no reason why Plaintiff's counsel should not include in his fee

---

[8]      Plaintiff requested $13,900 for fees incurred with respect to the ultra vires claim.  This amount represents 69.5 hours at counsel's rate of $200 per hour.  The Court will disallow fees for the 16 hours relating exclusively to the ultra vires claim.  Additionally, Plaintiff requested fees for 53.5 hours for time spent opposing Defendants' motion for summary judgment.  40 percent of this time is 21.4 hours.  21.4 hours multiplied by counsel's rate of $200/hour results in a fee of $4,280.

application time spent in telephone conferences with his client or

opposing counsel that relate to this case.  The Court also finds it unreasonable to require that Plaintiff

set forth with exacting scrutiny every detail of such calls, or the precise subject matter.

The Court does agree, however, that Plaintiff should not be compensated for six hours of time spent

"work[ing] on itemization of time spent in case."  Although the Court does not necessarily find that this

is a secretarial task as Defendants suggest, the Court does find that nearly a day's work to reconstruct

time spent on this case is excessive and should not have been required if Plaintiff's counsel was

maintaining contemporaneous time records throughout this case.  The Court does not find Defendants

should bear the cost of this "itemization," and Plaintiff's fee award will be reduced by $1200 (6 hours x

$200/hour).

Plaintiff has also requested a fee enhancement of 20% to compensate counsel for a delay in

nonpayment.  Defendants oppose the request, arguing that Plaintiff has not adequately made a case for

imposing such a substantial enhancement, and that Plaintiff's counsel bears significant responsibility for

any delay in payment.  Although in some cases the lodestar may be adjusted upward to account for

costs incurred as a result of a delay in payment, the burden is at all times on the plaintiff to demonstrate

the costs that resulted from a delay in payment.  Keenan v. City of Philadelphia, 983 F.2d 459, 462

(3d Cir. 1992).  In this case, Plaintiff asserts that a substantial 20% enhancement be paid due to delay.

Plaintiff's mere suggestion that a 20% enhancement is appropriate is clearly inadequate.  The Court

does not find that Plaintiff has demonstrated that a fee enhancement is warranted in this case –

particularly a fee enhancement of 20% – and the request will be denied.

Finally, the Court turns to Plaintiff supplemental request for attorney's fees.  (Doc. No. 154.)

In the supplemental request, Plaintiff seeks an additional $27,380 for fees incurred with respect to all

post-trial activity in this case.  Defendants' opposition to the additional fees is largely anticipatory:

Defendants assert Plaintiff should not receive additional fees to the extent he is found to be unsuccessful

in his requests for post-trial relief, or to the extent Defendants prevail on their request for judgment as a

matter of law or a new trial.  Thus, Defendants contend that Plaintiff should not be awarded fees for

16.9 hours spent on Plaintiff's Rule 59(e) motion for reinstatement to the extent the motion is

unsuccessful.  However, for the reasons set forth above, the Court has found reinstatement warranted

in this case, and there is no reason Plaintiff's counsel should not be compensated for litigating this issue

successfully.  Similarly, Plaintiff's counsel spent almost 42 hours researching a responding to

Defendants' Rule 50 and Rule 59 motions, and Defendants argue that Plaintiff should not recover to the

extent Defendants prevail on these motions.  As discussed above, Plaintiff clearly prevailed over

Defendants on the Rule 50 motion in that the Court will deny Defendants' renewed motion for judgment

as a matter of law or a new trial.  Defendants motion to amend the judgment under Rule 59(e)

succeeded in striking Plaintiff's award for punitive damages, but not in any other respect.  In sum,

Plaintiff not only prevailed at trial, but he was substantially successful in moving for post-trial relief, and

in defeating Defendants' own post-trial motions.  The Court does not find it necessary to reduce the

time Plaintiff spent in briefing and responding to motions on which he was largely successful.

Defendants argue that Plaintiff's counsel should not be compensated for 7.75 hours for re-

reading the trial transcript because the entries are vague and the time incurred unreasonable.  The Court

agrees that 8 hours spent reviewing the transcript appears somewhat excessive and potentially

duplicative in light of the fees already incurred for researching and responding to Defendants' post-trial

motions, and in advancing his own post-trial motions.  Accordingly, the Court finds it appropriate to reduce Plaintiff's award by $1550 (7.75 hours x 200/hour) relating to this time.

Lastly, Defendants assert Plaintiff should not recover fees for 31 hours spent preparing a reply brief in support of his original fee petition, particularly where counsel spent only 4 hours preparing the original fee petition, and spent a considerable amount of time adjusting and amending the original fee petition to correct deficiencies.  Additionally, Defendants contend that Plaintiff should not be reimbursed for 1.5 hours of time spent on a supplemental fee petition that is four lines in length, refers to no legal authority, and incorporates, by reference, earlier briefs.  The Court agrees with both arguments.  The Supreme Court has cautioned that fee applications should not devolve into a second litigation.  Hensley, 461 U.S. at 437.  That is precisely what seems to be happening in this case.  Although the Court appreciates that Plaintiff is constrained to respond to Defendants objections to his fee petition, the Court does not find that Defendants should be forced to subsidize Plaintiff's costly effort to clarify or bolster his fee petition through a reply brief that required more than 30 hours of work.  The Court will reduce Plaintiff's supplemental fee award by $6300 (32.5 hours x $200/hour).

To summarize, Plaintiff's fee award will be calculated as follows:

| | |
|---|---|
| $103,605 | Total Fees Claimed |
| ($17,320) | Reduced fees for unwarranted time |
| **$86,285** | **Total Fee Award** |

**IV.     Order**

And now, this 30th day of September 2005, for the reasons set forth in the within

memorandum, **IT IS HEREBY ORDERED THAT:**

1.     Defendants' Rule 50 Motion to Renew Defendants' Motion for Judgment as a Matter
       of Law and Alternative Request for a New Trial Under Rule 59 (Doc. No. 130) is
       **DENIED**.

2.     Defendants' Rule 59(a) Motion to Alter or Amend the Judgment (Doc. No. 129) is
       **GRANTED** in part and **DENIED** in part.  Plaintiff's award of punitive damages is
       **STRICKEN**.  In all other respects, the motion is denied.

3.     Plaintiff's Rule 59(e) Motion to Alter or Amend Judgment (Doc. No. 127) is
       **GRANTED**.  Defendants are hereby ordered to reinstate Plaintiff to his former
       employment within the Maintenance Department at Harrisburg International Airport or
       to enter into a mutually agreeable settlement in lieu of reinstatement.

4.     Plaintiff's Petition for Attorney's Fees (Doc. No. 128) and Supplemental Petition for
       Attorney's Fees (Doc. No. 154) are **GRANTED** in part.  Defendants are hereby
       directed to pay Plaintiff $86,285 for attorney's fees incurred in this action.


                                    __S/ Yvette Kane_____
                                    Yvette Kane
                                    United States District Judge